UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

LAYLA M. VOGT,
on behalf of
Allen L. Vogt,

       Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

18-CV-231
DECISION AND ORDER

---

On February 12, 2018, the plaintiff, Layla M. Vogt, brought this action under the Social Security Act ("the Act"). She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that Allen L. Vogt was not disabled.[1] Docket Item 1. On October 15, 2018, Vogt moved for judgment on the pleadings, Docket Item 10; on December 13, 2018, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 13; and on January 7, 2019, Vogt replied. Docket Item 14.

For the reasons stated below, this Court grants Vogt's motion in part and denies the Commissioner's cross-motion.

---

[1] Allen Vogt passed away on May 6, 2017, while his claim was pending before the Appeals Council. Docket Item 10-1 at 2-3. Allen Vogt's daughter, Layla Vogt, was subsequently designated as the substitute party on his behalf. Docket Item 10-1 at 2-3. The Commissioner does not challenge the authority of Layla Vogt to bring this action. *See Davis ex rel. Maitland v. Colvin*, 2013 WL 1183000, at *5 n.14 (N.D.N.Y. Feb. 27, 2013).

## BACKGROUND

**I.     PROCEDURAL HISTORY**

On November 20, 2013, Allen L. Vogt applied for Supplemental Security Income benefits ("SSI"). Docket Item 7 at 114. He claimed that he had been disabled since January 1, 2009, due to chronic obstructive pulmonary disease, hypertension, carpal tunnel syndrome, and neuropathy. *Id.* at 114-15.

On January 22, 2014, Vogt received notice that his application was denied because he was not disabled under the Act. *Id.* at 125-35. He requested a hearing before an administrative law judge ("ALJ"), *id.* at 137-45, which was held on December 28, 2015, *id.* at 78. The ALJ then issued a decision on April 29, 2016, confirming the finding that Vogt was not disabled. *Id.* at 55. Vogt appealed the ALJ's decision, but his appeal was denied, and the decision then became final. *Id.* at 5-7.

**II.    HEARING TESTIMONY**

Vogt and his attorney engaged in the following dialog with respect to his carpal tunnel syndrome at the hearing:

Q. Can you tell me a little bit about your carpal tunnel currently?

A. Well, as you can see, my left hand is quite a bit smaller than my right and the muscle, muscle loss and whatever.

Q. And do you experience carpal tunnel in—you had problems with both hands?

A. Yes.

Q. Okay. Let's talk about the left hand first. I mean which—is one hand better than the other?

A. My right hand is better than my left hand.

2

> Q. Okay. So let's talk about the left hand first. What are you able to do with your left hand.
>
> A. Not much, virtually nothing.
>
> Q. Can you—
>
> A. I can't pick much of anything up.
>
> Q. Can you pick up, like, a coffee mug or a plate?
>
> A. With my right hand, I usually can pick up with my right hand so I don't break it.
>
> Q. So you tend to drop things?
>
> A. Yes.
>
> Q. Okay, so with your—what's the last thing you lifted with your left hand?
>
> A. I don't—I really don't know.
>
> Q. Okay. So you don't use your left hand for—
>
> A. Not much.
>
> Q. Okay.

Docket Item 7 at 92-93. Later, the ALJ clarified:

> Q. So since your surgery you haven't used your left hand for much of anything?
>
> A. No, not much of anything.

*Id.* at 95.

### III. RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Vogt's claims. Vogt was examined by several different providers but only three—John Callahan, M.D., an orthopedic surgeon; S. David Miller, M.D., a physiatrist; and David Avino, M.D., an internist—are of significance to this Court's review of Vogt's disability claim.

3

### A. John Callahan, M.D., Orthopedic Surgeon

On March 22, 2013, Vogt visited John Callahan, M.D., an orthopedic surgeon, with complaints of "left hand pain." Docket Item 7 at 307. Vogt told Dr. Callahan that his hand pain did not arise from a specific injury but instead that his "symptoms have been present for 5 years." *Id.* Vogt also told Dr. Callahan that he had "a continuously sharp and throbbing pain" and rated "his pain as a 6/10 that is worse with activity." *Id.* He reported "associated numbness, shooting pain, popping, snapping, swelling, tingling, and weakness." *Id.* On April 9, 2013, Dr. Callahan noted that there "is intrinsic atrophy of the left hand." *Id.* at 318. On May 1, 2013, Dr. Callahan noted that although Vogt's left hand did not have a "deformity," there was "hypothenar eminence atrophy and intrinsic atrophy of the hands bilaterally." *Id.* at 305.

On June 4, 2013, Dr. Callahan operated on Vogt to address the carpal tunnel syndrome in his left hand. Docket Item 7 at 275-76. Dr. Callahan explained that Vogt had had "progressive signs and symptoms of . . . left carpal tunnel and cubital tunnel syndrome, unresponsive to conservative care to date." *Id.* at 275. Ten days later, Vogt followed up with Dr. Callahan's office and a physician assistant supervised by Dr. Callahan noted upon examination that Vogt had "[a]trophy of the left hand." *Id.* at 302.

On September 12, 2013, Vogt complained to Dr. Callahan that he was still experiencing pain in both hands. *Id* at 331. Dr. Callahan said that "it takes at least 6 months to get more relief" and that "[i]t may take up to 1 1/2 years to totally get full benefit f[rom] the surgery." *Id.* at 332, 345.

4

### B. S. David Miller, M.D., Physiatrist

On May 9, 2013, Vogt visited S. David Miller, M.D., a physiatrist. Docket Item 7 at 247-51. Vogt's chief complaint was "[w]eakness and atrophy of the left hand." *Id*. at 247. Vogt explained that his hand impairments "develop[ed] . . . over the past few years . . . without a clear precipitating event/injury." *Id*. Dr. Miller found that there was "intrinsic atrophy of the left hand with relative sparing of left thenar musculature." *Id*.

### C. David Avino, M.D., Internist

On May 23, 2013, David Avino, M.D., an internist, examined Vogt and conducted a stress test. Docket Item 7 at 258. Dr. Avino noted that Vogt

> exercised for 1 minute and 45 seconds on a standard Bruce protocol. He stopped because of leg pain probably due to peripheral occlusive vascular disease of the lower extremities. He achieved a workload of approximately 3 METS. The resting heart rate was 77 and increased to 147 near maximal exercise. This is 92% of the patient's age predicted maximum heart rate. The resting blood pressure was 170/90 and increased to 220/90 near maximal exercise indicating probably a hypersensitive response to exercise. No angina developed. . . . The Duke treadmill score was round at 2.

*Id.*

## IV. THE ALJ'S DECISION

In denying Vogt's application, the ALJ evaluated Vogt's claim under the Social Security Administration's five-step evaluation process for disability determinations. *See* 20 C.F.R. § 404.1520. At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful employment. § 404.1520(a)(4)(i). If so, the claimant is not disabled. *Id.* If not, the ALJ proceeds to step two. § 404.1520(a)(4).

At step two, the ALJ decides whether the claimant is suffering from any severe impairments. § 404.1520(a)(4)(ii). If there are no severe impairments, the claimant is

5

not disabled. *Id.* If there are any severe impairments, the ALJ proceeds to step three. § 404.1520(a)(4).

At step three, the ALJ determines whether any severe impairment or impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). If the claimant's severe impairment or impairments meet or equal one listed in the regulations, the claimant is disabled. *Id.* But if the ALJ finds that none of the severe impairments meet or equal any in the regulations, the ALJ proceeds to step four. § 404.1520(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC"). *See* §§ 404.1520(a)(4)(iv); 404.1520(d)-(e). The RFC is a holistic assessment of the claimant—addressing both severe and nonsevere medical impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy. *See* 20 C.F.R. § 404.1545.

After determining the claimant's RFC, the ALJ completes step four. 20 C.F.R. § 404.1520(e). If the claimant can perform past relevant work, he or she is not disabled and the analysis ends. § 404.1520(f). But if the claimant cannot, the ALJ proceeds to step five. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f).

In the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1520(a)(4)(v), (g). More specifically, the Commissioner bears the burden of proving that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

In this case, the ALJ determined at step one that Vogt had not engaged in "substantial gainful activity during the period from his alleged onset date of January 1, 2009, through his date last insured of December 31, 3013." Docket Item 7 at 51. At step two, the ALJ found that Vogt had several medically determinable impairments: "chronic obstructive pulmonary disease ("COPD"), carpal tunnel syndrome, and hypertension." *Id.* But the ALJ then found that Vogt "did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore [he] did not have a severe impairment or combination of impairments." *Id.* at 52.

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id.* This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application

7

of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## **DISCUSSION**

"[T]he Social Security Amendments Act . . . define[s] 'disability' as 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (quoting 42 U.S.C. § 423(d)(1)(A)). At step two of the sequential evaluation process, a disability claim is rejected only "[i]f [a claimant does] not have any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

"Step Two may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). The severity requirement at step two "increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely that they would be found to be disabled even if their age, education, and experience were taken into account." *Bowen*, 482 U.S. at 153. But the step two analysis is designed only to "weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability." *Id.* at 156 (O'Connor, J., concurring).[2] Conversely, step two "does not permit the Secretary to

---

[2] Justice O'Connor's concurring opinion in *Bowen* has been recognized as the controlling interpretation of the step two standard. *See Dixon v. Shalala*, 54 F.3d 1019, 1030-31 (2d Cir. 1995).

8

deny benefits to a claimant who may fit within the statutory definition without determining whether the impairment prevents the claimant from engaging in either his prior work or substantial gainful employment that, in light of the claimant's age, education, and experience, is available to him in the national economy." *Id.* at 158. In other words, "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking this vocational analysis." *Id.*

An ALJ's decision that a combination of impairments is no greater than "slight abnormalities that do not significantly limit any 'basic work activity,'" *id.*, must be "supported by 'substantial evidence' in the record as whole." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). And a step two finding that a claimant's impairment "is nonsevere is not supported by substantial evidence [when] the evidence on which it is based is inconsistent with evidence that [the claimant's impairment] significantly impaired her ability to do basic work activities." *Parker-Grose v. Astrue*, 462 F. App'x 16, 17-18 (2d Cir. 2012). For example, in *Parker-Grose*, the ALJ found at step two that the claimant's depression was nonsevere. *Id.* at 17. But one psychologist had opined that the claimant "was experiencing depression" and another psychologist noted that she experienced "'moderate symptoms' including 'moderate difficulty in school, work, and social functioning.'" *Id.* at 18 (quoting Admin. R. 455). In that case, substantial evidence did not support the ALJ's conclusion that the claimant's impairment was nonsevere. *Id.*

A review of the cases sustaining step two findings of nonsevere impairments also is instructive. In *Wavercak v. Astrue*, 420 F. App'x 91 (2d Cir. 2011), for example, the

9

claimant alleged that his sleep apnea was a severe impairment, but at the hearing, "when asked to explain how sleep apnea affected him during the time in question, [the claimant] responded that his fatigue and day-time drowsiness were caused more by the pain in his neck than from any sleep disorder." *Id.* at 93. Because the claimant was "unable" to "point to a medical exhibit in the record that documented the presence of sleep apnea" at any relevant time, finding a nonsevere impairment at step two was supported by the record. *Id.*

Likewise, in *Reynolds v. Colvin*, 570 F. App'x 45 (2d Cir. 2014), the plaintiff argued that the ALJ had erred in determining that the claimant, his wife, "was severely impaired by cancer, but not by neck and back pain" between the years 2001 and 2006. *Id.* at 47. The only evidence supporting the significance of that impairment, however, was a "1989 cervical spine MRI and June 3, 1991 office note . . . generated more than a decade prior to the relevant period." *Id.* And it was "undisputed that in the interim, [the] claimant worked at substantial gainful activity, a circumstance making it difficult to infer severe impairment from the earlier records." *Id.* Again, the ALJ's finding of a nonsevere impairment at step two was sustained.

Here, there is little doubt that the ALJ's decision at step two was erroneous. More specifically, the finding that Vogt's combination of impairments is no greater than "slight abnormalities that do not significantly limit any 'basic work activity,'" *Bowen*, 482 U.S. at 158 (O'Connor, J., concurring), is not "supported by 'substantial evidence' in the record as whole," *Veino*, 312 F.3d at 586. In fact, that determination "is inconsistent with evidence that [Allen Vogt's combination of impairments] significantly impaired [his] ability to do basic work activities." *Parker-Grose*, 462 F. App'x at 17-18.

To begin, when Vogt appeared before the ALJ at the hearing, he not only used words to describe the nature and severity of his hand impairment, but he also physically showed the ALJ that his "left hand is quite a bit smaller than [his] right." Docket Item 7 at 92. If that were untrue or inaccurate, one would expect the ALJ to have said otherwise at the hearing or to have corrected the record in his decision in his decision. *See Klemens v. Berryhill*, 703 F. App'x 35, 36 (2d Cir. 2017) (quoting *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010)) ("Among the ALJ's legal obligations is the duty to adequately explain his reasoning in making findings on which his ultimate decision rests, and in doing so he must address all pertinent evidence."); *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) (ALJs must "confront the evidence in [a claimant's] favor and explain why it was rejected before concluding that [his] impairments [do] not impose more than a minimal limitation on [his] ability to perform basic work tasks."); *Chiappa v. Sec'y of Dep't of Health, Educ. and Welfare*, 497 F. Supp. 356, 358 (S.D.N.Y. 1980) ("ALJs must let the parties and the reviewing courts know, in some intelligible fashion, where they stand on pivotal issues of fact posed by the applications they adjudicate."). But the ALJ did neither. And it is hard to fathom how having one hand with atrophy that made it "quite a bit smaller" than the other could be considered a "slight abnormalit[y] that do[es] not significantly limit any 'basic work activity.'" *Bowen*, 482 U.S. at 158 (O'Connor, J., concurring).

That is especially so for Vogt, whose last job was working for eighteen years as a "millwright" at an automobile component manufacturer and who alleged a disability beginning at age fifty-five. Vogt worked with his hands, and he would have had trouble adapting to new types of work at his "advanced age." *See* 20 C.F.R. § 404.1563(e). So

11

Vogt's hand atrophy was likely not just a "slight abnormality." *Bowen*, 482 U.S. at 158 (O'Connor, J., concurring).

Vogt's visible hand atrophy was far from the only evidence in support of his impairment, however. Dr. Callahan and Dr. Miller both documented "atrophy of the left hand" multiple times, *see* Docket Item 7 at 247, 302, 318, consistent with Vogt's testimony that his left hand was smaller. Indeed, Vogt's left-hand impairment was so severe that he required surgery during the relevant period. *Id.* at 275-76. What is more, in 2013 Vogt told his treating physicians that his hand pain had been the same for several years. *Id.* at 307. And there is no indication that Vogt worked from the time he had his hand surgery in 2013 until the hearing date in 2015.

Finally, when Vogt stopped seeing Dr. Callahan for financial reasons, his hand problem had not improved significantly. *Id.* at 331-32. Dr. Callahan then told him that it might take up to a year and a half to get the full benefit of surgery. *Id.* at 332, 345. What that full benefit might be, of course, remained to be seen. But Vogt had done what he could to get medical help for his hand issues, *see, e.g., id.* at 286, and it therefore was not surprising that he did not continue to see Dr. Callahan for medical care that would have to pay for himself. *See id.* (noting on September 4, 2013, that Vogt's "insurance will not cover any more visits [and Vogt] therefore did not wish to schedule anymore [sic] visits").

Vogt's hand atrophy and weakness was not his only impairment either. For example, the ALJ summarily dismissed Vogt's hypertension impairment, finding it to be non-severe because "it has been described as benign . . . and well controlled with medication." Docket Item 7 at 54. The ALJ also noted that there "is no evidence that

hypertension causes the claimant to be significantly limited in his ability to perform basic work-related activities for 12 consecutive months." *Id.* But those findings also are "not supported by substantial evidence since the evidence on which [they are] based is inconsistent with evidence that [Vogt's hypertension] significantly impaired [his] ability to do basic work activities." *Parker-Grose*, 462 F. App'x at 17-18. Specifically, the ALJ's conclusion is inconsistent with Dr. Avino's stress test showing that Vogt could exercise for only a minute and forty-five seconds before experiencing leg pain due to vascular disease. Docket Item 7 at 258. And in that minute and forty-five seconds, Vogt's blood pressure rose from 170/90 to 220/90 "indicating . . . a hypersensitive response to exercise." *Id.* That evidence—unaddressed by the ALJ—suggests that Vogt's hypertension may well have been more than a "slight abnormalit[y] that d[id] not significantly limit any 'basic work activity.'" *Bowen*, 482 U.S. at 158 (O'Connor, J., concurring).

For the foregoing reasons, the ALJ's conclusion that Vogt had no impairments that are anything more than "slight abnormalities that do not significantly limit any 'basic work activity,'" *id.*, is not supported by "'substantial evidence' in the record as whole." *Veino*, 312 F.3d at 586. Of course, that does not mean Vogt was disabled. But the ALJ erred by ending his analysis of Vogt's claims at step two and failing to "determin[e] whether [Vogt's] impairment[s] prevent[ him] from engaging in either his prior work or substantial gainful employment that, in light of [Vogt's] age, education, and experience,

is available to him in the national economy." *Bowen*, 482 U.S. at 158 (O'Connor, J., concurring).[3]

**CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 13, is DENIED, and Vogt's motion for judgment on the pleadings, Docket Item 10, is GRANTED in part and DENIED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.[4]

SO ORDERED.

Dated: September 16, 2019
Buffalo, New York

    *s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE

---

[3] This Court "will not reach the remaining issues raised by [Vogt] because they may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003)).

[4] On remand, the ALJ also should consider the cause of Vogt's death. Because a "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death," 42 U.S.C. § 423(d)(1)(A), if Vogt died from a medically determinable physical or mental impairment, his death could be evidence that one of the impairments he suffered from could have been "expected to result in death," *id.*